IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CORY SHANNON MARQUIS,<br><br>               Plaintiff,<br><br>vs.<br><br>JOHN UECKER, in his official capacity as a Resident Agent for the U.S. Department of Agriculture, Agricultural Marketing Service, Fair Trade Practices Program, Packers and Stockyards Division; AGRICULTURAL MARKETING SERVICE, FAIR TRADE PRACTICES PROGRAM, PACKERS AND STOCKYARDS DIVISION, an agency within the U.S. Department of Agriculture; and U.S. DEPARTMENT OF AGRICULTURE, a federal agency,<br><br>               Defendants. | CV 23-15-BLG-SPW<br><br><br>ORDER |

Before the Court is a Motion to Dismiss filed by Defendants John Uecker, in his official capacity as a Resident Agent for the U.S. Department of Agriculture, Agricultural Marketing Service, Fair Trade Practices Program, Packers and Stockyards Division, *et al.* (collectively, "Defendants"). (Doc. 20). Defendants contend that Plaintiff Cory Shannon Marquis's Complaint fails to state a claim on which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). (*Id.*). For the following reasons, the Court grants Defendants' motion.

1

## I.    Background

Plaintiff co-owns Marquis Cattle Company, which buys and sells cattle in Montana and around the country. (Doc. 1 at 5). Plaintiff alleges that, on April 16, 2021, Defendant Uecker authored an investigative report ("Report") finding that Plaintiff had violated the Packers and Stockyards Act and committed forgery, wire fraud, and bank fraud. (*Id.* at 8.).[1] The Report contains unredacted confidential information and trade secrets of Plaintiff and his company. (*Id.* at 9; Doc. 7). Plaintiff further alleges Uecker disclosed the Report to the county attorneys of Yellowstone and Judith Basin counties. (Doc. 1 at 9; Doc. 21-1 (letter from USDA Deputy Administrator authorizing release of the Report to the Judith Basin County Attorney)).

Based on the contents of the Report, the Yellowstone County Attorney charged Plaintiff with one count of forgery in violation of Montana Code Annotated § 45-6-325 on March 25, 2022. (Doc. 1-2 at 26–29). On September 21, 2022, the Judith Basin County Attorney charged Plaintiff with two counts of felony deceptive practices in violation of Montana Code Annotated § 45-6-317(1)(a) and one count of theft in violation of Montana Code Annotated § 45-6-301(1)(a). (*Id.* at 30–43).

Plaintiff states he was arrested by the Judith Basin County Sheriff pursuant to the charges and posted bail. (Doc. 1 at 11). Plaintiff also asserts that the Judith

---

[1] The report is filed under seal with the Court. (Doc. 7).

Basin County charging documents, which are a public record, contain confidential information, including detailed information about Plaintiff's business and client lists and Marquis Cattle Company's bank account numbers. (*Id.* at 10).

## II.    Legal Standard

A Rule 12(b)(6) motion tests the legal sufficiency of a pleading.  Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  To survive Rule 12(b)(6) motion, the pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible if the pleading alleges enough facts to draw a reasonable inference that the accused is liable. *Id.*  Though the pleading does not need to provide detailed factual allegations, it cannot merely assert legal conclusions. *Twombly*, 550 U.S. at 555.

When ruling on a Rule 12(b)(6) motion, the Court must accept the complaint's well-pled factual allegations as true and construe them in the light most favorable to the non-movant. *See Autotel v. Nev. Bell Tel. Co.*, 697 F.3d 846, 850 (9th Cir. 2012). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

3

### III.   Analysis

While Plaintiff's criminal charges were pending, Plaintiff filed the instant suit in this Court against Defendants, alleging that Uecker improperly disclosed his Report to the respective county attorneys in violation of 7 U.S.C. § 222 of the Packers and Stockyards Act ("PSA").  (Doc. 1 at 11–13).  Specifically, Plaintiff asserts that Defendants violated 15 U.S.C. § 46(f) of the Federal Trade Commission Act ("FTCA")—which Plaintiff argues is incorporated by reference into 7 U.S.C. § 222—by submitting the Report to the respective prosecutors' offices, rather than a law enforcement agency, and by doing so without certification that the respective county attorneys' offices would keep the information confidential.  (*Id.* at 11–12).  Plaintiff also maintains Defendants violated 15 U.S.C. § 46(k) of the FTCA—which Plaintiff argues is incorporated by reference into 7 U.S.C. § 222—by submitting the Report to state county attorneys rather than the U.S. Attorney General.  (*Id.* at 13).

Defendants assert two grounds for dismissal: First, the FTCA provisions that Plaintiff invokes do not apply because they have not been incorporated into the PSA; and second, even if those provisions apply and Defendants violated them, the *Younger* abstention doctrine requires the Court to decline to exercise jurisdiction to issue the requested relief.  The Court will address each argument in turn.

A.     *Applicability of 15 U.S.C. § 46(f) and (k)*

Whether the current versions of 15 U.S.C. § 46(f) and (k) are incorporated into the PSA depends on (1) whether Title 7 of the U.S. Code (PSA) is direct evidence of the law or only prima facie evidence of the law; and (2) if only prima facie evidence of the law, if it conflicts with or mirrors the direct evidence of the law, namely the correlated Statutes at Large. Whether a title in the Code is direct or only prima facie evidence of the law implicates "the process by which enacted laws are organized for public consumption, known as codification." Jarrod Shobe, *Codification and the Hidden Work of Congress*, 67 UCLA L. Rev. 640, 641 (2020). This process "has mostly escaped the notice of judges and scholars of legislation, and is not explained in textbooks meant to introduce lawyers to the creation and interpretation of the law." *Id.* "The failure of courts and scholars to understand how the Code comes to be … has left significant gaps in current theories and practice of statutory interpretation." *Id.* at 642.

Defendants employ an outgrowth of the codification process—positive and non-positive law—as the basis for their argument concerning the inapplicability of 15 U.S.C. § 46(f) and (k). Though their argument is coherent to someone familiar with the nuances of legislation, the obscurity and technicality of Defendants' argument, as Shobe and other scholars acknowledge, compels the Court to first explain how the codification process impacts the interpretation of enacted law.

When a bill is first enacted, it is published by the Government Publishing Office as a standalone document called a slip law. *Id.* at 649. Each law is assigned a Public Law number based on the session of Congress and the order of its enactment within that session. *Id.* At the end of each congressional session, the Government Publishing Office compiles all the slip laws from that session into a single volume known as the Statutes at Large. *Id. See* 1 U.S.C. § 112 (directing the Archivist of the United States to compile, edit, index, and publish the Statutes at Large).

The Statutes at Large are "a chronological compilation of the laws exactly as they were enacted by Congress, with the same organization and content as the bill approved by Congress." Shobe, *supra*, at 649. The slip laws contained in the Statutes at Large are not updated or changed to account for subsequent enactments or amendments. *Id.* So, to understand the current version and past changes to a law just using the Statutes at Large, one would have to review every volume of the Statutes at Large since the original enactment of an act. *Id.* at 649–50.

In response to this logistical problem, Congress created the first method of compiling the laws in their most current form in 1866, though the codification process used today was established in 1926. Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the* United States Code, 112 Law Libr. J. 213, 218 (2020). The current codification process tasks the Office of the Law Revision Counsel with organizing and compiling all the bills passed by

Congress into the U.S. Code. *Id.* at 219, 220; Shobe, *supra*, at 651. Because of the compilation process, the Code originally was only ever prima facie evidence of the law; if any discrepancy existed between the Code and the Statutes at Large, the language of the latter would govern. Shobe, *supra*, at 651. Congress continued to rely on the Statutes at Large as direct evidence of the law because codification imperfectly translated bills into the Code, resulting in the omission of hundreds of permanent provisions that some believed should have been included in the Code. *Id.*

In the 1940s, Congress sought to remedy the discrepancies between the Statutes at Large and the Code by providing for a method by which Congress would vote bills directly into Code form. *Id.* Congress would examine a specific title of the Code—which was prepared by the Office of the Law Revision Counsel—to determine if it conformed with the collective acts passed by Congress throughout its history. Nevers & Krishnaswami, *supra*, at 221. Once Congress was satisfied that a title of the Code accurately reflected the current state of the law, it would enact the title as "positive law" and repeal the prior provisions of the Statutes at Large that correlated to the provisions of that title. *Id.* "When enacted into positive law, the provisions of the United States Code 'shall be legal evidence of the laws therein contained, in all courts of the United States....'" *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1440 (D.C. Cir. 1988) (quoting 1 U.S.C. § 204(a). *See also* Shobe, *supra*, at 658 (the titles of the Code that have been enacted as positive

7

law "reflect[] Congress's decisions about both the content and the organization of the law with a few caveats."). Congress also can amend a positive law title directly, rather than amending the underlying the acts and having the Office of Law Revision Counsel translate the amended acts into the Code. Shobe, *supra*, at 658. Since positive law codification began in 1940, Congress has enacted only 27 of the 54 titles of the Code into positive law. Nevers & Krishnaswami, *supra*, at 221. *See* Office of the L. Revision Counsel, *United States Code*, http://uscode.house.gov/browse.xhtml (last visited Jan. 5, 2024) (an asterisk next to a title denotes that Congress has enacted that title as positive law).

For the remaining titles of the Code that Congress has not enacted into positive law, such titles remain non-positive law and only prima facie evidence of the law. 1 U.S.C. § 204(a); Shobe, *supra*, at 659 (Non-positive law titles "serve as a handy compilation of the law that is easier to read and cite than the Statutes at Large even though [they] are not authoritative."). The Statutes at Large constitute "legal evidence" of those non-positive laws. 1 U.S.C. § 112. Where the language of the Statutes at Large conflicts with the language in a non-positive provision of the U.S. Code, the language of the Statutes at Large controls. *United States v. Welden*, 377 U.S. 95, 98 n.4 (1964) ("[T]he Code cannot prevail over Statutes at Large when the two are inconsistent").

Titles 7 and 15 are non-positive laws and therefore only prima facie evidence of the law. Office of the L. Revision Counsel, *supra*, http://uscode.house.gov/browse.xhtml. Accordingly, the Court must look at whether the Statute at Large codified at 7 U.S.C. § 222—section 402 of the PSA, Pub. L. No. 67-50, 42 Stat. 159, 168 (1921)—conflicts with the language of 7 U.S.C. § 222.

Section 402 of the PSA reads:

> For the efficient execution of the provisions of this Act and in order to provide information for the use of Congress, *the provisions (including penalties) of sections 6, 8, 9, and 10 of the Act entitled "An Act to create a Federal Trade Commission to define its powers and duties for other purposes," approved September 26, 1914,* are made applicable to the jurisdiction, powers, and duties of the Secretary in enforcing the provisions of this Act and to any person subject to the provisions of this Act, whether or not a corporation. The Secretary, in person or by such agents as he may designate, may prosecute any inquiry necessary to his duties under this Act in any part of the United States.

Packers and Stockyards Act, Pub. L. No. 67-50, § 402, 42 Stat. 159, 168 (1921) (emphasis added).[2]

7 U.S.C. 222 (current through Pub. L. No. 118-22) reads:

> For the efficient execution of the provisions of this chapter, and in order to provide information for the use of Congress, *the provisions (including penalties) of sections 46 and 48 to 50 of title 15,* are made applicable to the jurisdiction, powers, and duties of the Secretary in enforcing the provisions of this chapter and to any person subject to the provisions of this chapter, whether or not a corporation. The Secretary, in person or by such agents as he may designate, may prosecute any

---

[2] The only amendment to the original version of § 402 was in 1935 and added the words "or any live poultry dealer or handler" after any reference to "packer" in §§ 202, 401, 402, 403, and 404 of the PSA. *See* 7 U.S.C. § 222 (as amended by Pub. L. No. 74-272, 49 Stat. 469 (1935)).

> inquiry necessary to his duties under this chapter in any part of the
> United States.

(emphasis added).

As the italicized portions of each demonstrate, § 402, 42 Stat. at 168, and 7

U.S.C. § 222 are not identical: The former incorporates by reference §§ 6, 8, 9, and

10 of "An Act to create a Federal Trade Commission to define its power and duties

for other purposes," approved September 26, 1914, while the latter incorporates by

reference 15 U.S.C §§ 46, 48, 49, and 50. Because the Statute at Large and Code

conflict, § 402, 42 Stat. at 168 governs.

Looking to § 402, the Court notes it incorporates by reference a specific

section of a specific bill passed on a specific date. Given that specificity and the fact

that the PSA has never been amended to incorporate by reference the current

language of the FTCA, the Court must look to §§ 6, 8, 9, and 10 of "An Act to create

a Federal Trade Commission to define its power and duties for other purposes,"

approved September 26, 1914, to determine what language is incorporated into the

PSA. Pub. L. 63-203, 38 Stat. 717, 721–724 (1914). The relevant provision gives

the Federal Trade Commission the power:

> to make public from time to time such portions of the information
> obtained by it hereunder, except trade secrets and names of customers,
> as it shall deem expedient in the public interest; and to make annual and
> special reports to the Congress and to submit therewith
> recommendations for additional legislation; and to provide for the
> publication of its reports and decisions in such form and manner as may
> be best adapted for public information and use.

10

Federal Trade Commission Act, Pub. L. No. 63-203, §6(f), 38 Stat. 717, 721 (1914).

The language invoked by Plaintiff from § 46(f) and (k) for Counts 1 and 2 is absent from 38 Stat. at 721 and was only added in 1980 and 2006, respectively. Pub. L. No. 96-252 § 3(a); Pub. L. No. 109-455, § 4(b). In fact, a (k) did not exist until the 2006 amendment. Accordingly, neither 15 U.S.C. § 46(f) nor (k) as they currently exist are incorporated by reference into the PSA, and Defendants are not bound to them.

Defendants identify two laws they argue, and the Court agrees, bind Defendants. First, PSA § 407, which is identical to its Code counterpart at 7 U.S.C. § 228, authorizes the Secretary of Agriculture and their agents to "cooperate with any department or agency of the Government, any State, Territory, District, or possession, or department, agency, or political subdivision thereof, or any person[.]" Section 407, 42 Stat. at 169. Second, 9 C.F.R. § 201.96 bars an agent or employee of the United States, without the consent of a stockyard owner, market agency, dealer, packer, swine contractor, or live poultry dealer, from,

> divulg[ing] or mak[ing] known in any manner, any facts or information regarding the business of such person acquired through any examination or inspection of the business or records of the stockyard owner, market agency, dealer, packer, swine contractor, or live poultry dealer, or through any information given by the stockyard owner, market agency, dealer, packer, swine contractor, or live poultry dealer *except to such other agents or employees of the United States as may be required to have such knowledge in the regular course of their official duties or except insofar as they may be directed by the*

> *Administrator or by a court of competent jurisdiction, or except as they*
> *may be otherwise required by law.*

(emphasis added).

### B.    Abstention

Now that the Court clarified the applicable law, the Court usually would decide whether Defendants had complied with the law.  However, here, the Court must engage an interim step, namely whether the *Younger* abstention doctrine applies and requires the Court to refrain from exercising its jurisdiction to grant Plaintiff's requested relief.

"[A] federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Arevalo v. Hennessey*, 882 F.3d 763, 765 (9th Cir. 2018) (quoting *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013)). "*Younger* abstention remains an extraordinary and narrow exception to the general rule[.]" *Id.* (quoting *Cook v. Harding*, 879 F.3d 1035, 1038 (9th Cir. 2018)). The doctrine directs courts to abstain from interfering with certain ongoing state criminal, civil, and administrative proceedings, *id.*, to ensure state courts can try state cases "free of federal interference," *Gilbertson v. Albright*, 381 F.3d 965, 970 (9th Cir. 2004) (discussing *Younger v. Harris*, 401 U.S. 37, 43–45 (1971)).

Abstention under the *Younger* doctrine is appropriate when "(1) there is an ongoing state judicial proceeding; (2) the proceeding implicates important state

interests; (3) there is an adequate opportunity in the state proceedings to raise constitutional challenges; and (4) the requested relief seeks to enjoin or has the practical effect of enjoining the ongoing state judicial proceeding." *Arevalo*, 882 F.3d at 765 (internal citation and quotation marks omitted). However, "even if *Younger* abstention is appropriate, federal courts do not invoke it if there is a 'showing of bad faith, harassment, or some other extraordinary circumstance that would make abstention inappropriate.'" *Id.* at 765–66 (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 425 (1982)).

*Younger* involved a state criminal prosecution which the federal plaintiff sought to enjoin on the grounds that the state law under which he was charged was unconstitutional. 401 U.S. at 39. The Court denied his request for equitable relief because the plaintiff had a proceeding pending in state court when the plaintiff sought to enjoin it, that proceeding afforded him the opportunity to raise his constitutional claims, and the plaintiff did not show that the state prosecution was brought in bad faith. *Gilbertson*, 381 F.3d at 970 (summarizing *Younger*, 401 U.S. 37). *Younger* has successively been interpreted to instruct courts to "almost never enjoin state criminal proceedings.[]" *Id.* at 975.

*Younger* also has been extended to a variety of other criminal and civil matters. As relevant here, the Court has held that courts must refrain from exercising actions for declaratory relief because "ordinarily a declaratory judgment will result

13

in precisely the same interference with and disruption of state proceedings that the longstanding policy limiting injunctions was designed to avoid." *Samuels v. Mackell*, 401 U.S. 66, 72 (1971). From *Samuels* and its successors, the Ninth Circuit summarized that federal courts should abstain when a court's interference with the state proceeding would have "the same practical effect on the state proceeding as a formal injunction." *Gilbertson*, 381 F.3d at 978. For instance, as relevant here, federal courts "must refuse to intervene in state criminal proceedings to suppress the use of evidence claimed to have been obtained through unlawful means." *Kugler v. Helfant*, 421 U.S. 117, 130 (1975). *See also Perez v. Ledesma*, 401 U.S. 82, 84 (1971) ("It is difficult to imagine a more disruptive interference with the operation of the state criminal process short of an injunction against all state proceedings" than a federal court suppressing illegally obtained evidence in a state court proceeding).

As for the relief the Court should grant if *Younger* abstention applies, it must dismiss the case, unless damages are at issue. *Gilbertson*, 381 F.3d at 975. If damages are at issue, a stay is proper. *Id.*

The Supreme Court has identified two policies guiding *Younger* abstention: "the constraints of equity jurisdiction and the concern for comity in our federal system." *Id.* at 970 (discussing *Younger*, 401 U.S. at 43–45). As to the constraints of equity jurisdiction, "[c]ourts have long had discretion not to exercise equity jurisdiction when alternatives are available, and narrowly confined ability to do so

when the object is a criminal prosecution." *Id.* "In modern times, as *Younger* explains, equitable principles prevent erosion of the role of the jury and duplication of legal proceedings when a single suit would be adequate to protect the rights asserted." *Id.* The "[p]rinciples of comity, on the other hand, preserve respect for state functions such that the national government protects federal rights and interests in a way that will not 'unduly interfere with the legitimate activities of the States.'" *Id.* (quoting *Younger*, 401 U.S. at 44). Comity is the more "'vital consideration.'" *Id.* at 971 (quoting *Younger*, 401 U.S. at 44).

Here, Plaintiff does not dispute that he has ongoing state proceedings, those proceedings implicate important state interests, and he has an adequate opportunity in his state proceedings to raise constitutional challenges. Rather, Plaintiff's primary dispute with the application of *Younger* abstention is that his requested relief neither enjoins nor has the practical effect of enjoining the state proceedings. (Doc. 22 at 11). Plaintiff contends that barring Uecker from testifying and providing prosecutors with more information will not effectively enjoin the state proceedings because state prosecutors should have developed their own evidence independent of Uecker. (*Id.* at 11–12). Plaintiff notes that Uecker's unsigned report contains Uecker's personal conclusions and is inadmissible as hearsay. (*Id.* at 12).

Plaintiff also contends that bad faith and harassment exist here because Defendants' alleged failure to comply with federal law "indicates bad faith in and of

itself." (*Id.* at 14). Defendants have engaged in further harassment and bad faith, according to Plaintiff, because Uecker has been sitting at the prosecutors' tables during the proceedings "as though he were a state law enforcement officer." (*Id.*). Last, the affidavits attached to Plaintiff's complaint supposedly demonstrate "the unusual manner in which Uecker exposed the confidential information of Marquis." (*Id.* at 14–15). Plaintiff alternatively asserts that he can provide additional facts to show a pattern of misconduct, bad faith, and harassment if the Court deems it necessary, so the Court should grant any motion to amend. (*Id.* at 16–17).

Defendants disagree, arguing that the "only practical effect" of Plaintiff's requested relief is the halting of the state proceedings because Plaintiff is effectively asking the Court to prevent Uecker from testifying to his investigation, which "appears to provide the foundation for these prosecutions[.]" (Doc. 23 at 9 (citing *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043, 1044 (9th Cir. 2019))). Additionally, Plaintiff is effectively asking the Court to rule on a motion in limine in the state proceedings by asking the Court to declare the report and Uecker's testimony inadmissible. (*Id.* at 7) (citing *Morrison v. County of Yellowstone*, CV 23-56-BLG, 2023 WL 3727531, at *2 (D. Mont. May 30, 2023)). As to the allegations of bad faith and harassment, Defendants argue that Plaintiff's assertions are misplaced because Ninth Circuit caselaw instructs the court to look at "the conduct *of the state judicial forum* the federal plaintiff seeks to affect, not the parties

in the state action whose conduct is addressable in the state forum via motions, sanctions, and other devices." (*Id.* at 9 (citing *Page v. King*, 932 F.3d 898, 902 (9th Cir. 2019); *San Jose Silicon Valley Chamber of Com. Pol. Action Comm. v. City of San Jose*, 546 F.3d 1087, 1093 (9th Cir. 2008)) (emphasis in brief)).  Since Plaintiff does not allege nor is there any evidence of bad faith or harassment by the state district courts in Judith Basin and Yellowstone counties, no bad faith or harassment exists that would justify the Court declining to abstain. (*Id.*).

Plaintiff's requested relief falls into two categories: injunctive and declaratory relief. As for the injunctive relief, Plaintiff requests the Court preliminarily and permanently enjoin Defendants from providing additional information to the prosecutors and enjoin Uecker from testifying in Plaintiff's criminal proceedings. As for the declaratory relief, Plaintiff asks the Court to declare that Defendants' actions violate the PSA and 15 U.S.C. § 46(f) and (k).  Plaintiff last asks the Court to declare that all proscribed information provided to the prosecutors be "clawed back" from these offices. (Doc. 22 at 16). The Court construes this as equitable rather than declaratory relief, since it asks the Court to require a third party to act, not to declare the rights and other legal relations of parties. *See* 28 U.S.C. § 2201(a).

Starting with the equitable relief, Plaintiff's case on its face is certainly not like *Younger*, in that Plaintiff is not asking the Court to halt the state proceedings against him because of allegedly illegal conduct.  However, Plaintiff's request has

17

the practical effect of enjoining the state proceedings.  Plaintiff effectively is asking the Court to prohibit the introduction of certain evidence on the grounds that it was illegally obtained, which the Supreme Court has rejected as a basis for a federal court intervening in a state criminal proceeding.  *See Kugler*, 421 U.S. at 129–30; *Perez*, 401 U.S. at 84.   And given that the equitable relief has the practical effect of enjoining the state proceedings against Plaintiff, the affiliated declaratory relief by extension must have the same practical effect under *Samuels*.  401 U.S. at 72.

Plaintiff's proposition that the Court's intervention is minimal because Uecker's investigation was incomplete and the report is hearsay also raises the question of why Plaintiff cannot remedy his complaints with a motion in limine and cross-examination in his state proceedings: if his investigation was incomplete, his attorney's job is to highlight that through testimony.   And if Plaintiff believes the report is hearsay or otherwise inadmissible, then he can move in the state courts to have it excluded through a motion in limine.  *See Morrison*, 2023 WL 3727531, at *2 (the plaintiff "may raise his claims of insufficiency of the evidence and/or challenge the manner in which he has been prosecuted in the district court and on direct appeal").  The Court's query highlights *Younger* abstention's concern for equitable jurisdiction, which directs the Court to decline jurisdiction when alternative remedies are available, and comity.  *See Gilbertson*, 381 F.3d at 970

Plaintiff's case is not saved by his allegations of bad faith and harassment. "In the *Younger* context, bad faith 'generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction.'" *Baffert v. Calif. Horse Racing Bd.*, 332 F.3d 613, 621 (9th Cir. 2003) (quoting *Kugler*, 421 U.S. at 126 n.6). Harassment "may occur when the state prosecution 'was initiated with and is animated by a retaliatory, harassing, or other illegitimate motive.'" *Cornell v. Off. of Dist. Attorney, Cty. of Riverside*, 616 F. Supp. 3d 1026, 1036 (C.D. Cal. 2022) (quoting *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 199 (2d Cir. 2002). Plaintiff has not alleged that prosecutors engaged in either.

Plaintiff similarly has not alleged extraordinary circumstances that would justify the Court refusing to abstain. "'Extraordinary circumstances' have not been cataloged fully[.]" *Baffert*, 332 F.3d at 621. Among the types of extraordinary circumstances that the Ninth Circuit has recognized are when "a statute 'flagrantly and patently' violates 'express constitutional prohibitions in every clause, sentence and paragraph,'" *Aiona v. Jud. of Haw.*, 17 F.3d 1244, 1248–49 (9th Cir. 1994) (quoting *Younger*, 401 U.S. at 53)); when the state court delays a case to an extreme with "no end in sight," *Page*, 932 F.3d at 902; and "where the danger of irreparable loss is both great and immediate," *Arevalo*, 882 F.3d at 766 (internal citation omitted). The irreparable harm exception has been invoked, for instance, when a pretrial detainee presents a colorable Double Jeopardy claim and when a pretrial

detainee raises a due process challenge to his pretrial detention. *See Bean v. Matteucci*, 986 F.3d 1128, 1133–34 (9th Cir. 2021).

None of these circumstances, or ones that rise to the same level, exist here. Plaintiff does not argue a statute is unconstitutional or that the state courts have delayed the respective cases. Plaintiff asserts that Defendants' actions have caused Plaintiff and his business irreparable harm "in the form of the authorized disclosure of customer names and financial information, public disclosure of the business bank account information, loss of revenue and customers, as well as physical and emotional harm." (Doc. 1 at 11). Though the Court acknowledges that such harm is real and potentially great, Plaintiff's remedy is a protective order and/or motion for sanctions in the state court proceedings, not an order from this Court. Given the simplicity of the remedy in state court, as well as *Younger* abstention's concerns for equitable jurisdiction when alternative remedies are available and for the respect of comity, the Court does not find the circumstances so extraordinary so as to justify its intervention.

Thus, the Court declines to exercise its jurisdiction in this case under *Younger* and finds dismissal proper.

## IV.  Conclusion

IT IS SO ORDERED that Defendants John Uecker, in his official capacity as a Resident Agent for the U.S. Department of Agriculture, Agricultural Marketing

Service, Fair Trade Practices Program, Packers and Stockyards Division, *et al.*'s

Motion to Dismiss (Doc. 20) is GRANTED.

Under Rule 12(b)(6), a motion to dismiss may be granted with or without

prejudice, and with or without leave to amend.  "[A] district court should grant leave

to amend even if no request to amend the pleading was made, unless it determines

that the pleading could not possibly be cured by the allegation of other facts." *Lopez*

*v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d

494, 497 (9th Cir. 1995)).  Plaintiff asserts he can provide additional facts to show a

pattern of misconduct, bad faith, and/or harassment, which would require the Court

not to abstain.  Thus, leave to amend is proper.

Accordingly, the Court dismisses Plaintiff's claims without prejudice and

with leave to amend.

DATED the 5th day of February, 2024.

SUSAN P. WATTERS
U.S. DISTRICT JUDGE